IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

3A COMPOSITES USA, INC.                                          PLAINTIFF

V.                              CASE NO. 5:14-CV-5147

UNITED INDUSTRIES, INC. and
WESLEY PAULIN                                                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendants United Industries, Inc.'s ("United") and Wesley Paulin's Motion for Summary Judgment (Doc. 68), Brief in Support (Doc. 69) and attachments thereto, and Statement of Material Facts Not In Dispute (Doc. 70); Plaintiff 3A Composites USA, Inc.'s ("3A") Response in Opposition (Doc. 78-1), Statement of Disputed Material Facts (Doc. 76-1), and Evidence in Opposition (Docs. 77, 79) and attachments thereto; and Defendants' Reply (Doc. 85).  For the reasons given below, Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

3A[1] and United are competing manufacturers of graphic arts polystyrene display board ("Board").  3A is headquartered in Statesville, North Carolina, and employs roughly 2,700 people.  United is headquartered in Bentonville, Arkansas, and employs roughly 100 people.

One of the raw components of Board is something called "thick foam."  Until nearly 2007, both 3A and United purchased thick foam from outside suppliers.

---

[1] 3A has conducted business under a variety of different names over the years, as the result of reorganizations and mergers.  For the sake of simplicity, 3A and all of its predecessor entities are referred to as "3A" throughout this Opinion.

However, at some point around a decade and a half ago, 3A began exploring the feasibility of producing thick foam in-house.

In 2005, 3A formally launched a project to develop its own thick foam production line.  3A retained an outside consultant named Ed LeDuc to help with the project.  The parties disagree somewhat on the scope of Mr. LeDuc's oversight, but there is no doubt that he played a critical role in the line's development and had a significant amount of responsibility.   The project development team also had members who were 3A employees—one of whom was Mr. Paulin: 3A's Product Development Manager.  Mr. Paulin was the "startup manager" of this particular project.

In December 2006, 3A successfully produced its desired quality of thick foam and began selling thick foam to United.  From then until 2013, 3A was United's primary supplier of thick foam.   During this period, Mr. LeDuc continued providing *ad hoc* assistance to 3A with refinement or trouble-shooting of its thick foam line.  Mr. Paulin remained employed at 3A until his resignation in December 2008.

In 2011, United began exploring the possibility of developing its own thick foam line.  United's President, John Ferm, met with Mr. LeDuc several times that year and ultimately decided to retain Mr. LeDuc as a consultant for that project.  Mr. LeDuc played essentially the same role in the development of United's thick foam line as he had played in the development of 3A's thick foam line, and the two foam lines were essentially identical, albeit with minor differences.  In June 2012, after learning that United was developing a thick foam line, 3A issued notice to United that it was cancelling their thick foam supply agreement.  In late 2012, United hired Mr. Paulin on

Mr. LeDuc's recommendation for the position of extrusion manager.  Upon his hiring, Mr. Paulin began assisting Mr. LeDuc in the development of United's thick foam line.

On February 1, 2013, United received a cease-and-desist letter from 3A, in which 3A informed United that Mr. Paulin owed a duty of confidentiality to 3A pursuant to a contract he had signed while employed there ("Confidentiality Agreement").  This was the first time that United learned of the existence of Mr. Paulin's Confidentiality Agreement.  3A also asserted that Mr. LeDuc owed 3A a duty of confidentiality.  3A contended that the technology and processes associated with its thick foam line were trade secrets, and demanded that United, Mr. LeDuc, and Mr. Paulin cease their efforts at copying its thick foam line.  United countered that the information at issue was neither confidential nor a trade secret, that no one was violating any legal duties, and that it would not stop developing its own thick foam line.  Mr. Paulin remains employed in the same role at United today.

On May 31, 2013, 3A initiated this lawsuit by filing its Complaint (Doc. 1) in the United States District Court for the Western District of North Carolina, alleging breach of contract against Mr. Paulin, tortious interference with contract against United, and misappropriation of trade secrets and deceptive trade practices against both Mr. Paulin and United.  3A sought both monetary and injunctive relief.  On July 9, 2013, United and Mr. Paulin filed separate Answers (Docs. 15, 17) and a Joint Motion to Change Venue (Doc. 18).  Defendants' Motion to Change Venue was granted (Docs. 26, 38), and on May 15, 2014, venue was transferred to this Court.

3A filed its Amended Complaint (Doc. 51) on October 1, 2014, setting forth essentially the same causes of action as were in its original Complaint, but with citations

to Arkansas law where applicable.  Defendants filed their Answer (Doc. 55) on October 14, 2014.   On December 19, 2014, Defendants filed their Motion for Summary Judgment on all counts.  (Doc. 68).  That Motion has now been fully briefed and is ripe for decision.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts.  *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997).  The moving party bears the burden of proving the absence of any material factual disputes.  Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).  These facts must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial."  *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397

F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

## III.  DISCUSSION

### A.  Choice of Law

Although venue was transferred to this Court under 28 U.S.C. § 1404(a) from the Western District of North Carolina, *see* Doc. 38, this Court must nevertheless apply the same state law that would have been applied by the original transferor court, which must be identified by looking to North Carolina's choice-of-law rules.  *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964); *Thorn v. IBM*, 101 F.3d 70, 72-73 (8th Cir. 1996); *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 600 (4th Cir. 2004). Under North Carolina law, "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of a contract, such a contractual provision will be given effect."  *Tanglewood Land Co., Inc. v. Byrd*, 299 N.C. 260, 262 (1980).  Here, the contract's choice-of-law provision explicitly invokes Missouri law (Doc. 69-16, ¶ 12); accordingly, Missouri law governs 3A's claim for breach of contract.

North Carolina's choice-of-law rules follow the *lex loci delicti* ("law of the place of the wrong") test to decide which state's law governs claims for tortious interference with a contract.  *See Synovus Bank v. Coleman*, 887 F. Supp. 2d 659, 669, 673-74 (W.D.N.C. 2012).  However, the rule is less clear in the context of actions that are creatures of statute, such as misappropriation of trade secrets or deceptive trade practices; there appears to be a split of authority within the North Carolina Courts of Appeals that has not  been resolved by the North Carolina Supreme Court, *see Stetser*

*v. TAP Pharm. Prods., Inc.*, 165 N.C. App. 1, 14-15 (2004), as to whether the appropriate rule is *lex loci delicti* or the "most significant relationship" test, *see, e.g.*, *United Virginia Bank v. Air-Lift Assocs., Inc.*, 79 N.C. App. 315, 321-22 (1986) (declining to follow *Andrew Jackson Sales v. Bi-Lo Stores, Inc.*, 68 N.C. App. 222, 224-25 (1984), which applied the "most significant relationship" test, and opting instead to apply the *lex loci delicti* test to a claim of deceptive trade practices).   In analyzing this split of authority, the Western District of North Carolina, whence the instant case was transferred, has concluded that the North Carolina Supreme Court "would apply the traditional *lex loci* rule rather than the most significant relationship test" in a deceptive trade practices case.   *United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126, 129 (W.D.N.C. 1991).   Three years ago, the Eastern District of North Carolina arrived at the same conclusion.   *Martinez v. Nat'l Union Fire Ins. Co.*, 911 F. Supp. 2d 331, 338 (E.D.N.C. 2012).   And only last year, the Eastern District of North Carolina starkly declared that "North Carolina's choice of law rules call for the application of the *lex loci delicti* . . . test to determine which law should apply for misappropriation of trade secrets."   *Domtar AI Inc. v. J.D. Irving, Ltd.*, 45 F. Supp. 3d 635, 641 (E.D.N.C. 2014).   Accordingly, this Court concludes that the original transferor court in the instant case would have applied the *lex loci delicti* rule to determine which state's laws govern all of 3A's claims other than breach of contract.

Under the *lex loci delicti* rule, the governing law is that of the state in which the plaintiff received the injury.   *See Synovus*, 887 F. Supp. 2d at 669.   3A cites *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 554, 555 (M.D.N.C. 1999) for the proposition that the state where the injury occurred is North Carolina, which is 3A's

principal place of business, rather than Arkansas, which is where the acts of misappropriation and uses of trade secrets are alleged to have occurred.  It is true that the Court in *Rhone* concluded that "the state where the injury occurred in a fraud claim is the state in which the plaintiff suffered the economic impact," and that the plaintiff "suffered injury from the alleged fraudulent misrepresentations . . . where its . . . headquarters are located."  *Id.*  However, the North Carolina Court of Appeals has explicitly criticized *Rhone*, and other federal cases, for failing to "reconcile this apparent bright line 'place of business' rule with the choice of law analyses conducted by this Court" in cases "where a plaintiff has clearly suffered its pecuniary loss in a particular state, irrespective of that plaintiff's residence or principal place of business."  *See Harco Nat. Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 696-97 (2010).  In *Synovus*, the Western District of North Carolina approvingly cited *Harco* en route to concluding that "[w]hile the Defendant is a resident of South Carolina, his alleged pecuniary losses were clearly suffered in North Carolina, *as the real estate at issue is located here and the purchase transaction was completed here.*"  887 F. Supp. 2d at 669 (emphasis added).  And even more recently, the Eastern District of North Carolina recognized in *Domtar* that "[a]lthough North Carolina law is sparse on the point, other jurisdictions have held that the *lex loci delicti* is not the place where the information was learned, but where the tortious act of misappropriation and use of the trade secret occurred."  43 F. Supp. 3d at 641 (citing *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1456 n.3 (M.D.N.C. 1996); *Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 735 F. Supp. 1555, 1568 (M.D. Ga. 1989), *aff'd as modified*, 908 F.2d 706 (11th Cir. 1990); *Wilson v. Electro*

*Marine Sys., Inc.*, 915 F.2d 1110, 1115 (7th Cir. 1990); *Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 115 (D. Mass. 2001)).

This Court agrees with the Court in *Domtar* "that the *lex loci delicti* here is where the actual misappropriation and use of the trade secret occurs." *Id.*  This Court believes, furthermore, that the same conclusion would have been reached by the original transferor court in the instant case. *Cf. United Dominion*, 762 F. Supp. at 129-31 (rejecting the argument that the location of a corporation's "pocketbook" should override the location where the offending conduct occurred, because that argument "would allow a corporation to conduct an entire transaction in a foreign jurisdiction and urge the law of the corporation's state of residency in subsequent litigation").  In the instant case, and as the original transferor Court noted when it transferred venue, "the underlying conduct challenged by [3A] occurred in Arkansas."  (Doc. 38, p. 2).  Accordingly, Arkansas law governs 3A's claims for tortious interference, trade secret misappropriation, and deceptive trade practices.

### B.  Trade Secret Claims

3A brings claims for monetary and injunctive relief under the Arkansas Trade Secrets Act ("ATSA") against United and Mr. Paulin.  In order to obtain monetary relief under the ATSA, a claimant must prove actual misappropriation of a trade secret; however, injunctive relief may be provided even merely for "threatened" misappropriation, Ark. Code Ann. § 4-75-604(a), upon proof of the misappropriation's "inevitability."  *Texarkana Behavioral Assocs., L.C. v. Universal Health Servs., Inc.*, 748 F. Supp. 2d 1008, 1015 (W.D. Ark. 2010) (citing *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transport Servs., Inc.*, 336 Ark. 143, 152 (1999)).

8

Defendants argue that they should be granted summary judgment on 3A's ATSA claims for two independent reasons.  Defendants' first argument is that 3A cannot show that United used "improper means" to acquire 3A's trade secrets.  3A counters that it is not necessary to prove improper means in order to prove misappropriation under Ark. Code Ann. § 4-75-601(2)(B)(ii)(c), and that regardless, improper means can be proven. The ATSA defines "misappropriation" as follows:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i)     Used improper means to acquire knowledge of the trade secret; or

    (ii)    At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

        (a) Derived from or through a person who had utilized improper means to acquire it;

        (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (iii)   Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Ark. Code Ann. § 4-75-601(2).  The ATSA defines "improper means" as "includ[ing] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Ark. Code Ann. § 4-75-601(1).

3A is obviously correct that the words "improper means" do not explicitly appear in the definition of "misappropriation" that is located at Ark. Code Ann. § 4-75-601(2)(B)(ii)(c).  However, this subsection clearly contemplates one of the examples of "improper means" specifically listed in the ATSA's definition of that term: "breach or inducement of a breach of a duty to maintain secrecy."  Ark. Code Ann. § 4-75-601(1). In other words, the critical question raised by Defendants' improper-means argument is: does the record, when viewed in the light most favorable to 3A, permit a reasonable inference that United ever used information that it obtained from Mr. Paulin or Mr. LeDuc that, at the time of such use, United knew, or had reason to know, that Mr. Paulin or Mr. LeDuc had a duty to 3A not to disclose?  The answer to this question is: yes. Specifically, 3A has presented evidence that on March 24, 2008, United's President (Mr. Ferm) was placed on notice during a visit to one of 3A's facilities that 3A considered its "machinery and equipment, know-how, data, processes, machine configurations, procurement requirements and customer names" to be "confidential and proprietary." *See* Doc. 79-17, p. 1.  And Defendants themselves concede that "LeDuc helped develop almost exactly the same [thick foam line] at United as he had done at 3A, only six years earlier, and . . . that he quite intentionally copied most of the components of the [thick foam line]."  (Doc. 69, p. 23).[2]

---

[2] There appears to be a material factual dispute as to the extent, if any, to which the information at issue in this case was truly confidential, as well as to whether the information was the property of 3A or of Mr. LeDuc. *Compare* Doc. 85-1, p. 6 *with* Doc. 79-18; *see also* Doc. 78-1, pp. 31-32. This dispute has enormous implications for whether the information meets the definition of a trade secret under Arkansas law. *See Texarkana Behavioral Assocs.*, 748 F. Supp. 2d at 1013 (describing factors that must be met for a trade secret to exist).  Defendants did not assert the absence of any material factual dispute on the question of trade-secret status as grounds for summary

Defendants do not appear to be arguing that there is no material factual dispute as to whether Mr. Paulin used improper means, *see* Doc. 69, p. 22 ("The ATSA claim against Wes Paulin is a closer question because 3A can argue, at a minimum, that Paulin did have a signed Confidentiality Agreement still in place when he was hired by United in 2013."), but if such an argument is in fact being made, then the Court finds that a material factual dispute exists with regard to Mr. Paulin's use of improper means. At a minimum, there are specific facts in the record that would support a conclusion that on January 14, 2013, Mr. Paulin disclosed to other United employees the type of anti-seize he had observed 3A using on its thick foam line during his employment at 3A, *see* Doc. 77-52, p. 2, and that at the time of this disclosure, Mr. Paulin knew that he had a contractual duty to 3A to protect the confidentiality of this information, *see* Doc. 69-16, ¶¶ 1, 6; Doc. 70, ¶ 2.

Defendants' next argument is that 3A cannot show that any misappropriation of 3A's trade secrets was the proximate cause of 3A's damages.  The ATSA permits recovery of "damages for the actual loss caused by misappropriation."  Ark. Code Ann. § 4-75-606(a).  This Court is not aware of any Arkansas appellate court decisions on the matter, but observes that the Arkansas Supreme Court Committee on Model Jury Instructions has interpreted this statutory language as requiring proof of proximate cause.  Civil, AMI 2600 (2015 ed.).  And "while proximate cause is generally a fact issue to be decided by a jury, it becomes a question of law for the court when reasonable minds could not differ."  *Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 667 (8th Cir. 2009) (citing *Wilson v. Evans*, 284 Ark. 101 (1984)).

---

judgment, but they also appear not to be conceding the issue of trade-secret status for purposes of trial.  *See, e.g.*, Doc. 85, p. 4 & n.3.

To this end, Defendants contend that "3A lost its [thick foam line] business to United because (a) 3A unilaterally chose to end the relationship, (b) United hired Ed LeDuc and gained all necessary technical information from him, or (c) both." (Doc. 69, pp. 22 – 23). But 3A's President has offered a declaration to the effect that 3A cancelled its contract with United roughly nine months *after* United's President made the decision to retain Mr. LeDuc for the development of its own thick foam line, and that "3A cancelled this contract as a direct result of United's decision to develop a competing Graphic Arts Thick Foam line." *See* Doc. 77-62, ¶¶ 36 – 43; Doc. 77-2, pp. 40 – 41. Furthermore, as noted *supra* at p. 10 n.2, there remains a material factual dispute as to whether Mr. LeDuc owed 3A a duty to preserve the secrecy of 3A's technical information. Given all of these disputed material facts, reasonable minds can differ on the issue of proximate cause. Accordingly, Defendants' Motion is **DENIED** with regard to 3A's claims against United and Mr. Paulin for monetary and injunctive relief under the ATSA.

### C. Preemption

The ATSA expressly "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret." Ark. Code Ann. § 4-75-602(a). However, it "does not affect . . . [c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret[.]" Ark. Code Ann. § 4-75-602(b)(1). Defendants argue that this means that 3A's claims for breach of contract, tortious interference, and deceptive trade practices are all preempted, because each claim "is based directly upon an alleged misappropriation of trade secrets." (Doc. 69, p. 15). 3A counters that in Mr. Paulin's confidentiality agreement with 3A, he "pledged to

keep this information confidential—regardless of its trade secret status," and that "[u]nauthorized use or disclosure of confidential information that does not rise to the level of trade secret is a contract claim distinct from statutory misappropriation of trade secrets." *See* Doc. 78-1, p. 31; *see also* Doc. 69-16.

The upshot of the positions the parties have staked out on this issue, is that both sides appear to be operating under the assumption that the ATSA contemplates preemption of contract claims and that, as with ATSA preemption analysis of non-contractual civil claims, it matters in the first place whether a contract claim is based upon misappropriation of a trade secret. This is understandable, given that the ATSA's preemption section explicitly states that it "does not affect . . . [c]ontractual . . . liability or relief that is not based upon misappropriation of a trade secret." Ark. Code Ann. § 4-75-602(b)(1). But the Uniform Law Comment to this section of the ATSA indicates that the intent of the law was actually to exempt *all* contractual claims from preemption, regardless of whether such claims are based upon misappropriation of trade secrets: "This Act . . . does not apply to a duty voluntarily assumed through an express or an implied-in-fact contract. The enforceability of covenants not to disclose trade secrets and covenants not to compete that are intended to protect trade secrets, for example, is governed by other law." *Id.* cmt.

This Court has been unable to find any cases from the Arkansas Supreme Court or Arkansas Court of Appeals that address the extent, if any, to which the ATSA preempts contractual claims. A 2010 trade-secrets case from the Western District of Arkansas states without further explanation that the plaintiff's contract claim was "exempted" from preemption. *Texarkana Behavioral Assocs.*, 748 F. Supp. 2d at 1013

(citing *R.K. Enter., LLC v. Pro-Comp Mgmt., Inc.*, 356 Ark. 565, 574 (2004))[3].  However, this Court has found a more strongly analogous and persuasive case from the District of Connecticut that deals with the contractual preemption issue in the context of identical language in Connecticut's Uniform Trade Secrets Act ("CUTSA").

In *Imaginative Research Associates, Inc. v. Ramirez*, "[t]he parties dispute[d] whether a contract claim that is based upon misappropriation of a trade secret conflicts with CUTSA, and is therefore superseded by it."  718 F. Supp. 2d 236, 248 (2010) (internal quotation marks and alterations omitted).  The *Ramirez* Court acknowledged that "[t]he statute is not entirely clear," but concluded that the CUTSA does not preempt contract claims, regardless of "whether or not they are based on allegations of . . . having done anything more than misappropriate trade secrets."  *Id.*  In addition to relying on the Uniform Law Comment quoted *supra*, the *Ramirez* Court noted that the purpose of the Uniform Trade Secrets Act ("UTSA") "'was to harmonize and clarify the law of trade secrets,' whose principles var[ied] from jurisdiction to jurisdiction' because it was 'a common law development,'" *id.* at 248-49 (alterations in original) (quoting Ramon A. Klitzke, *The Uniform Trade Secrets Act*, 64 Marq. L. Rev. 277, 277 (1980) (citing Commissioners' Prefatory Note (1979))), and reasoned that "[b]ecause privately negotiated contractual obligations are applicable only to the parties to a contract, they do not create the variance in duties imposed by law among jurisdictions that UTSA sought to harmonize and clarify," *id.* at 249 (internal quotation marks omitted).  Furthermore, the *Ramirez* Court observed, the National Conference of Commissioners

---

[3] It appears that in *R.K. Enterprise*, preemption of contractual claims under the ATSA was one of the issues submitted on appeal, *see* Abstract and Brief of Appellants, 2003 WL 23716169, at *27 (Ark. Aug. 1, 2003), but ultimately the Arkansas Supreme Court limited its preemption analysis in that case to tort claims, *see* 356 Ark. at 574.

on Uniform State Law enacted amendments to the UTSA in 1985—after the states of Arkansas and Connecticut had adopted the 1979 version—that "clarified the intent of the 1979 Official Text."  The 1985 amendments provide that the UTSA "does not affect . . . contractual remedies, whether or not based upon misappropriation of a trade secret." *Id.* at 248 (emphasis removed) (quoting UTSA § 7(b)(1) (1985)).

This Court is persuaded, for the same reasons given in *Ramirez*, that "it is clear that [the ATSA] does not preempt . . . contract claims, regardless of whether those claims are premised on Defendants' alleged misappropriation of trade secrets."  *Id.* at 249.  Having so concluded, the Court turns now to the question of whether 3A's claims of tortious interference and deceptive trade practices are preempted.

When analyzing whether particular claims are preempted under the ATSA, Arkansas courts look to whether such claims "*stem from the same acts constituting a violation of the Trade Secrets Act.*"  *Jenkins v. APS Ins., LLC*, 2013 Ark. App. 746, at *7 (emphasis in original) (citing *R.K. Enter.,* 356 Ark. at 574).  As noted above, 3A argues that since Mr. Paulin's Confidentiality Agreement does not contain any language limiting the scope of its protection to trade-secret information, preemption of 3A's non-ATSA claims is avoided to the extent those claims concern confidential information that is not a trade secret.  In support of this argument, 3A cites an Arizona case, *Orca Commc'ns Unlimited, LLC v. Noder*, 337 P.3d 545 (Ariz. 2014), and a case from the United States District Court for the Eastern District of Arkansas, *Vigoro Indus. v. Cleveland Chem. Co.*, 866 F. Supp. 1150, 1161 (E.D. Ark. 1994).

*Orca* and *Vigoro* do support 3A's argument.  However, neither *Orca* nor *Vigoro* is a decision of the Arkansas Supreme Court or the Arkansas Court of Appeals, and those

cases' preemption analyses are inconsistent with more recent Arkansas caselaw.  In *Infinity Headwear & Apparel, LLC v. Coughlin*, the Arkansas Court of Appeals held that "the Trade Secrets Act is the exclusive remedy for the *alleged* misappropriation of trade secrets."  2014 Ark. App. 609, at *8 (emphasis added).  In *Infinity*, the plaintiff's original complaint had alleged trade-secrets misappropriation, but the circuit court had denied the plaintiff's motion for a temporary restraining order on the grounds that plaintiff's information did not meet the requirements under Arkansas law for trade-secret protection.  *See id.* at *2.   Subsequently, the plaintiff amended its complaint, abandoning its trade-secrets claim but keeping a conversion claim that was based on the same conduct that had originally been alleged to constitute trade-secrets misappropriation.  *See id.*  Nevertheless, the Arkansas Court of Appeals held that the plaintiff's conversion claim was preempted by the ATSA.  *Id.* at *8; *see also Welsco, Inc. v. Brace*, 2014 WL 4929453, at *25 (E.D. Ark. Sept. 30, 2014) ("Welsco's claim for breach of duty for wrongful disclosure and use of trade secrets is preempted by the ATSA as this claim relies on the same acts *alleged* in Welsco's claim for misappropriation of trade secrets." (emphasis added)).

The Court concludes that, as in *Infinity* and *Welsco*, 3A's claims for tortious interference and deceptive trade practices rely on the same acts that 3A alleges constitute misappropriation of trade secrets.  3A has not directed the Court's attention to any specific facts that it contends would give rise to liability under its tortious interference and deceptive trade practices claims without also constituting misappropriation of trade secrets; rather, it has simply offered vague speculation that

such facts might exist.[4]  This is insufficient to survive summary judgment.  Accordingly, 3A's claims for tortious interference and deceptive trade practices are preempted and **DISMISSED WITH PREJUDICE**.

### D.  Breach of Contract Claim

Other than the preemption argument discussed *supra*, Defendants raise only two arguments in favor of granting summary judgment on 3A's claim for breach of contract. The first is that the Confidentiality Agreement is unenforceable under Missouri law because of its eight-year term.   Defendants cite only one case in support of this argument: *AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714 (Mo. Ct. App. 1995). However, *AEE-EMF* is easily distinguishable.  Defendants are correct that in *AEE-EMF* a five-year contractual restraint was held unenforceable on the grounds that it was unreasonably long; but the restraint in *AEE-EMF* was not a confidentiality agreement—it was a non-compete agreement.  *Id.* at 723-24.

As the Eighth Circuit explained in *Synergetics, Inc. v. Hurst*, because non-compete agreements (also called "restrictive covenants") are in restraint of trade, they must be reasonable in duration and geographic scope in order to be enforceable under Missouri law.  477 F.3d 949, 958 (8th Cir. 2007) (citing *AEE-EMF*, 906 S.W.2d at 719). However, "[w]hile a restrictive covenant may be used to protect a trade secret, not every

---

[4] The Court would note furthermore that it has no obligation to conduct a painstaking review of the voluminous record for facts that the parties have not brought to its attention.  *See Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments"); *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662-63 (7th Cir. 1994) ("District judges are not archaeologists."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("Judges are not ferrets!").

agreement designed to protect a trade secret is a restrictive covenant." *Id.* In order for an agreement to be a restrictive covenant, it must "limit the exercise or pursuit of an individual's occupation." *Id.* The Confidentiality Agreement in the instant case does not do this. Since Defendants "have failed to cite to any requirement under Missouri law that confidentiality agreements must contain time . . . limitations to be valid," and since this Court has not "located such a requirement," this Court "cannot say that the [Confidentiality Agreement is] unenforceable for this reason." *Id.* at 959.

Defendants' sole remaining argument for summary judgment on 3A's contract claim is that 3A cannot prove that any breach by Mr. Paulin of the Confidentiality Agreement was a proximate cause of any damages suffered by 3A. Defendants are correct, of course, that "[u]nder Missouri law, in an action for breach of contract, in addition to recovering the benefit of his bargain, a plaintiff may also recover for damages naturally and proximately caused by the commission of the breach and for those that could have been reasonably contemplated by the defendant at the time of the agreement." *Mansfield v. Trailways, Inc.*, 732 S.W.2d 547, 552 (Mo. Ct. App. 1987). But "[i]n Missouri, it is a fundamental precept of contract law that nominal damages are available where a contract and its breach are established," *Hanna v. Darr*, 154 S.W.3d 2, 5 n.2 (Mo. Ct. App. 2004). And in Missouri, "[t]he existence of nominal damages is sufficient to preclude summary judgment." *Glenn v. Healthlink HMO, Inc.*, 360 S.W.3d 866, 872 (Mo. Ct. App. 2012).

As the Court observed *supra* at p. 11, "at a minimum, there are specific facts in the record that would support a conclusion that on January 14, 2013, Mr. Paulin disclosed to other United employees the type of anti-seize he had observed 3A using on

its thick foam line during his employment at 3A, see Doc. 77-52, p. 2, and that at the time of this disclosure, Mr. Paulin knew that he had a contractual duty to 3A to protect the confidentiality of this information, see Doc. 69-16, ¶¶ 1, 6; Doc. 70, ¶ 2."[5] Accordingly, Defendants' Motion is **DENIED** with regard to 3A's claim against Mr. Paulin for breach of contract.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants United Industries, Inc.'s and Wesley Paulin's Motion for Summary Judgment (Doc. 68) is **GRANTED IN PART AND DENIED IN PART** as follows:

Plaintiff 3A Composites USA, Inc. may proceed on its claims for breach of contract and violations of the Arkansas Trade Secrets Act, but all of its other claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this ____15th____ day of September, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[5] This should not be interpreted as a finding by the Court that this particular information was in fact a trade secret or contemplated by the Confidentiality Agreement, or that Mr. Paulin in fact knew or should have known that he had a contractual duty not to disclose this particular information; the Court is simply observing that on the record currently before it, a jury could reasonably make such findings.

19